LOEB & LOEB LLP
JOHN A. PISKORA (NJ ID 005412001)
jpiskora@loeb.com
FRANK D. D'ANGELO (*pro hac vice forthcoming*)
fdangelo@loeb.com
JEFFREY C. PRYSTOWSKY (*pro hac vice forthcoming*)
jprystowsky@loeb.com
345 Park Avenue
New York, NY  10154
Telephone:  +1 212-407-4000
Facsimile:   +1 212-407-4990

Attorneys for Plaintiffs,
HYBE Co. Ltd., BIGHIT MUSIC Co. Ltd.,
and HYBE America Inc.


## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| **HYBE CO. LTD. F/K/A/ BIG HIT ENTERTAINMENT CO. LTD., BIG HIT MUSIC CO. LTD. AND HYBE AMERICA INC.,** | Case No. _____ |
| **Plaintiffs,** | **MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' EX PARTE APPLICATION FOR A TEMPORARY RESTRAINING ORDER, SEIZURE ORDER, AND ORDER TO SHOW CAUSE WHY A PRELIMINARY INJUNCTION SHOULD NOT ISSUE** |
| **v.** | |
| **JOHN DOES 1-100, JANE DOES 1-100, AND XYZ COMPANIES 1-100,** | |
| **Defendants.** | **ORAL ARGUMENT REQUESTED** |

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................ ii

INTRODUCTION ............................................................................................1

ARGUMENT ...................................................................................................8

I.    THE SALE OF "BOOTLEG" MERCHANDISE VIOLATES PLAINTIFFS'
      EXCLUSIVE RIGHTS.............................................................................8

      A.    Defendants Are Violating Section 43(a) of the Lanham Act................8

      B.    Defendants Are Violating The Right of Publicity ............................12

      C.    Defendants Are Engaging in Unfair Competition.............................13

II.   PLAINTIFFS ARE ENTITLED TO A TEMPORARY RESTRAINING
      ORDER, AN ORDER OF SEIZURE, AND A PRELIMINARY
      INJUNCTION........................................................................................14

      A.    An Injunction and Order of Seizure Are Appropriate........................14

      B.    A Temporary Restraining Order, Without Notice, Is Available to
            Enjoin Activities of Persons Whose Identities Are Unknown............19

      C.    The Threatened Injury to Plaintiffs Outweighs Potential Harm to
            Defendants.................................................................................21

      D.    Plaintiffs Are Entitled to a Nationwide Preliminary Injunction ........22

CONCLUSION................................................................................................28

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

Am. Tel. & Tel. Co. v. Winback & Conserve Program, Inc.,
    42 F.3d 1421 (3d Cir. 1994) ...................................................................................13

Big Hit Entertainment Co. Ltd. v. Various John Does, et al.,
    Case No. 19-CV-03070 (N.D. Ill. 2019) .............................................................15

Birthright v. Birthright Inc.,
    827 F. Supp. 1114 (D.N.J. 1993)...........................................................................13

Buying For The Home, LLC v. Humble Abode, LLC,
    459 F. Supp. 2d 310 (D.N.J. Oct. 20, 2006).........................................................14

Epic Games, Inc. v. Google LLC (In re Google Play Store Antitrust
    Litig.), 147 F.4th 917 (9th Cir. 2025) ........................................................... 26-27

Faulkner v. Hasbro, Inc.,
    No. 15-6518 (KSH)(CLW), 2016 WL 3965200
    (D.N.J. July 21, 2016)............................................................................................12

Hard Rock Cafe Licensing Corp. v. Pacific Graphics, Inc.,
    776 F. Supp. 1454 (W.D. Wash. 1991) .................................................................22

Hart v. Elec. Arts, Inc.,
    717 F.3d 141 (3d Cir. 2013) ..................................................................................12

Int'l News Serv. v. Associated Press,
    248 U.S. 215 (1918).........................................................................................10, 13

Interspace Corp. v. Lapp, Inc.,
    721 F.2d 460 (3d Cir. 1983) ..................................................................................10

J & J Snack Foods, Corp. v. Earthgrains Co.,
    220 F. Supp. 2d 358 (D.N.J. Sep. 25, 2002).........................................................14

Joel v. Various John Does,
    499 F. Supp. 791 (E.D. Wis. 1980) .......................................................................17

Kessler v. Eldred,
    206 U.S. 285 (1907)......................................................................................24

Leman v. Krentler-Arnold Hinge Last Co.,
    284 U.S. 448 (1932)................................................................................24, 25

Merch Traffic, LLC v. Does 1-100,
    686 F. Supp. 3d 380 (D.N.J. Aug. 4, 2023)..........................................19, 20

Merch Traffic, LLC v. John Does 1-100, Jane Does 1-100, and XYZ
    Company, Case No. 26-cv-3738-EP-AME (D.N.J. Apr. 13, 2026)....................9

Nat'l Football League Props., Inc. v. New Jersey Giants, Inc.,
    637 F. Supp. 507 (D.N.J. May 8, 1986)..................................................11

Pacific Reins. Mgmt. Corp. v. Fabe,
    929 F.2d 1215 (7th Cir. 1991) ...............................................................25

Rubber Tire Wheel Co. v. Goodyear Tire & Rubber Co.,
    232 U.S. 413 (1914)...............................................................................24

SKS Merch, LLC v. Barry,
    233 F. Supp. 2d 841 (E.D. Ky. 2002) ...................................................21

Stiller v. Hardman,
    324 F.2d 626 (2d Cir. 1963) ............................................................25, 26

In re $uicideboy$ Trademark Litig.,
    796 F. Supp. 3d 1310, 1320-32 (N.D. Ga. 2025) ............................26, 27

The Five Platters, Inc. v. Purdie,
    419 F. Supp. 372 (D. Md. 1976)............................................................24

Trump v. CASA, Inc.,
    606 U.S. 831 (2025)..........................................................................26, 27

Two Pesos, Inc. v. Taco Cabana Inc.,
    505 U.S. 763 (1992).................................................................................10

Matter of Vuitton et Fils S.A.,
    606 F.2d 1 (2d Cir. 1979) .......................................................................18

iii

Vuitton v. White,
   945 F.2d 569 (3d Cir. 1991) ...............................................................................18

**Statutes**

15 U.S.C. § 1114 .................................................................................................15

15 U.S.C. § 1116 ............................................................................................15, 16

15 U.S.C. § 1116(a) .......................................................................................15, 24

15 U.S.C. § 1116(d)(4)(B) ..................................................................................20

15 U.S.C. § 1118 .................................................................................................15

15 U.S.C. § 1125(a)(1)(A) ....................................................................................9

**Other Authorities**

Fed. R. Civ. P. 4 .................................................................................................22

Fed. R. Civ. P. 65(a)(1)........................................................................................22

Fed. R. Civ. P. 65(b)(1)(A) ............................................................................16, 20

McKenney & Long, Federal Unfair Competition: The Lanham Act, §
   2:04 (1989)................................................................................................ 9-10

Plaintiffs HYBE Co. Ltd. f/k/a Big Hit Entertainment Co. Ltd. ("HYBE"), BIGHIT MUSIC Co. Ltd. ("BIGHIT"), and HYBE America Inc. ("HYBE America") (collectively, "Plaintiffs"), submit this Memorandum of Law in Support of their Application for a Temporary Restraining Order, a Seizure Order, and an Order to Show Cause Why a Preliminary Injunction Should Not Issue (the "Order").

## INTRODUCTION

The papers accompanying this Memorandum of Law establish that defendant bootleggers will sell, or attempt to sell, unauthorized, infringing, and counterfeit T-shirts, posters, and other merchandise ("Bootleg Merchandise") bearing the registered trademarks, service marks, images, likenesses, logos and other indicia (collectively, the "Trademarks") of the popular K-pop music group known as "BTS" (the "Artist") in the vicinity of the Artist's upcoming sold-out concert performances at MetLife Stadium in East Rutherford, New Jersey on August 1 and 2, 2026 (the "East Rutherford Shows") and during the rest of the Artist's upcoming U.S. tour (the "Tour"), in violation of section 43(a) of the Lanham Act, New Jersey's Unfair Competition Act, and common law prohibitions against unfair competition and right of publicity violations.

The U.S. Tour is underway, and bootleggers have already engaged in infringing activity by selling and distributing Bootleg Merchandise at each of BTS's first twelve U.S. stadium shows.  See Declaration of John Carruthers ("Carruthers

1

Decl.") ¶ 5, Exs. 1-4.  Plaintiffs respectfully request that the Court grant a temporary restraining order, an order permitting seizure of the bootleg merchandise, and ultimately a preliminary injunction prohibiting these unlawful acts.

BIGHIT owns the Artist's Trademarks and has conveyed to HYBE the exclusive right to exploit those Trademarks in connection with the production, distribution and sale of various types of music-related merchandise.  See Declaration of Seon Jeong Shin ("Shin Decl.") ¶¶ 2-3; Declaration of Dylan Dae Woo Kim ("Kim Decl.") ¶¶ 2-3.  HYBE has licensed the use of those Trademarks to its wholly-owned U.S. subsidiary HYBE America, which has contracted with Amazon.com Services, LLC ("Amazon") to distribute officially licensed merchandise bearing the Artists' Trademarks at MetLife Stadium on August 1 and 2, 2026.  See Shin Decl. ¶¶ 2-3; Kim Decl. ¶¶ 2-3; Declaration of Andrew Polner ("Polner Decl.") ¶ 1; Declaration of Joohae Kim ("Joohae Decl.") ¶ 3.  HYBE America's affiliates will also sell officially licensed merchandise at temporary retail locations known as "pop-up stores" in New York in connection with the group's concert performances at MetLife Stadium on August 1 and 2, 2026.  See Kim Decl. ¶ 5.

Plaintiffs and their licensees have already been victimized by bootlegging activity during the current U.S. Tour at multiple venues, including Raymond James Stadium in Tampa, Florida, on April 25, 26, and 28, 2026; Sun Bowl Stadium in El Paso, Texas, on May 2 and 3, 2026; Stanford Stadium in Stanford, California, on

May 16, 17, and 19, 2026; and Allegiant Stadium in Las Vegas, Nevada, on May 23, 24, 27, and 28, 2026. See Carruthers Decl. ¶ 5. At or near Raymond James Stadium in Tampa, bootleggers sold boxes of unauthorized t-shirts and posters.[1] See id. ¶ 5, Ex. 1. The Artist also issued a cease-and-desist letter to the Shoppes at Tampa International Airport demanding the removal of unauthorized BTS merchandise from its stores. See Declaration of Frank D'Angelo ("D'Angelo Decl.") ¶ 3, Ex. 31. At or near Sun Bowl Stadium in El Paso, bootleggers sold unauthorized photographs and t-shirts. See Carruthers Decl. ¶ 5, Ex. 2. At or near Stanford Stadium, bootleggers sold boxes of unauthorized t-shirts, sweatshirts, and jerseys. See id. Ex. 3. At or near Allegiant Stadium in Las Vegas, bootleggers sold unauthorized t-shirts and goodie bags. See id. Ex. 4.

The bootlegging activity witnessed on the Artist's current Tour is no different from what has happened on previous tours, including at the Artist's shows at MetLife Stadium in East Rutherford, New Jersey on May 18 and 19, 2019. Plaintiffs and their licensees were harmed by bootlegging activity during Artist's previous concert performances in 2018, 2019, and 2021 in New Jersey, Los Angeles, and Chicago. Starting at least as far back as performances on September 5 through 9, 2018 at the

---

[1] Acting under the authority of a temporary restraining order and order of seizure issued by the U.S. District Court for the Middle District of Florida, the Artist was able to seize these unauthorized goods. See D'Angelo Decl. ¶ 26, Ex. 30.

3

Staples Center in Los Angeles, HYBE representatives have witnessed at least dozens of bootleggers in the vicinity of concert venues where the Artist performed, selling unauthorized Bootleg Merchandise primarily consisting of t-shirts, posters, and other materials bearing the Artist's Trademarks. See Joohae Decl. ¶ 10, Ex. 8.

In an effort to combat such activity in connection with concert performances scheduled to take place in Los Angeles County several months later, HYBE (then known as "Big Hit Entertainment"), sought and obtained from the Superior Court of the State of California, Los Angeles County, a temporary restraining order and order of seizure, in connection with the Artist's concerts at the Rose Bowl in Pasadena on May 4-5, 2019. See D'Angelo Decl. Ex. 10. Acting under the authority of that Order, HYBE's authorized representatives, working with local law enforcement, seized 145 boxes of infringing Bootleg Merchandise, including approximately 5,000 bootleg BTS t-shirts, from an unauthorized "pop-up" store in Pasadena on the day of the Artist's first Rose Bowl performance on May 4, 2019. See Joohae Decl. ¶ 8, Exs. 5-6. That unauthorized retail operation was transparently designed to confuse prospective customers of legitimate and authorized tour merchandise being sold by official licensees nearby. See id. ¶ 7. In addition to those materials, 17 additional boxes of Bootleg Merchandise containing hundreds of infringing articles bearing the Artist's Trademarks, including unauthorized t-shirts, posters, photographs, and handheld fans were seized from the area immediately surrounding the Rose Bowl on

4

May 4-5, 2019—all of which were visibly of an inferior quality to the official tour merchandise being sold at and around the concert venue by official tour merchandise licensees.  See id. ¶ 9, Ex. 7.

Several days after those Rose Bowl performances, HYBE, acting under the authority of a separate temporary restraining order and order of seizure issued by the U.S. District Court for the Northern District of Illinois, see D'Angelo Decl. ¶ 6, Ex. 11, seized an additional 65 infringing articles of unauthorized Bootleg Merchandise from bootleggers operating in the vicinity of the Artist's concert performances at Soldier Field in Chicago, Illinois on May 11-12, 2019, and at MetLife Stadium in East Rutherford, New Jersey on May 18-19, 2019.  See Joohae Decl. ¶ 6, Ex. 3.

Bootleggers came out in full force in connection with the Artist's concert performances at SoFi Stadium in Los Angeles, California, on November 27-28 and December 1-2, 2021, and HYBE's authorized representatives, acting under the authority of a TRO and order of seizure issued by the Los Angeles County Superior Court November 2021, see D'Angelo Decl. ¶ 4, Ex. 9, seized four large boxes of unauthorized Bootleg Merchandise from nearly 40 bootleggers that were operating in the vicinity of the concert venue, see Joohae Decl. ¶ 5, Exs. 1-2.

Since 2021, the Artist's popularity has exponentially grown, and the demand for the current Tour has eclipsed that of even the previous massive tours of this Artist.  See Kim Decl. ¶ 6. On March 20, 2026, the Artist released its fifth Korean-

5

language studio album, *Arirang*.  Id.  The album is the group's first release since they went on hiatus for each member to complete their mandatory military service obligations in South Korea, resulting in a multi-year pause in full-group activities. Id.  During that period, fans patiently awaited their return to touring activities.  Id. Although solo releases and some individual touring helped with demand, a full group comeback with a new album and tour produces an exceptional, unparalleled, concentrated spike in demand.  Id.  *Arirang* debuted at number one on the U.S. Billboard 200, and its fourteen tracks filled the top fourteen spots of Spotify's global top-50 chart on its first day.  Id.  The album received a total of 110 million streams on Spotify—the most first-day Spotify streams for any 2026 album—and, on Apple Music, the album broke the record for most first-day streams ever for a pop group's album.  Id.  The album's performance exemplifies the pent-up commercial demand following the Artist's extended hiatus, which all but guaranteed that the current Tour would result in the highest activity of counterfeit and bootleg merchandise that Plaintiffs have seen on any other tour for the Artist—which has already been rampant.  See generally Carruthers Decl.

Given that such substantial bootlegging activity has already occurred in connection with the Artist's current Tour and previous concert performances and pop-up stores, including at MetLife Stadium in 2019, and based upon the immense popularity of the Artist—now one of the most commercially successful musical acts

in the world with one of the most engaged and ardent fan bases in all of pop music—Plaintiffs and their representatives anticipate that the areas surrounding the upcoming East Rutherford Shows will once again function as impromptu vending sites for bootleggers offering for sale Bootleg Merchandise bearing the Artist's name, image, logo, and/or trademarks, which will effect pecuniary and reputational harm on Plaintiffs, their licensees, the Artist, and the public at large unless restrained by this Court.  See id. ¶¶ 4-8; Shin Decl. ¶ 4-5.

It is evident from these recent experiences that the relief requested herein is the only method of protecting the public from inferior-quality merchandise which bears a false designation of origin, and protecting Plaintiffs from the damage to their and the Artist's goodwill that would be caused by the continued sale of Bootleg Merchandise.  See Polner Decl. ¶¶ 4-9.  Defendants can assert no defense to Plaintiffs' claims.  Not only are the proceeds from each bootleg merchandise sale irretrievably lost to Plaintiffs, but the damage to Plaintiffs' and the Artist's goodwill through the distribution of inferior merchandise cannot be calculated or remedied.  The need for an ex parte order is also evident.  The bootleggers' actions are completely unauthorized, and they have both the means and motivation to destroy vital evidence before a noticed hearing and avoid service.

Moreover, the public interest would be served by issuance of the relief requested, since the public interest favors the protection of legitimate property and

7

contractual rights. The Bootleg Merchandise is created and sold by individuals accountable to no one, whether for payment of royalties, income or sales taxes, or for quality control. There is no potential harm to any legitimate interest of defendants or any other persons if the requested relief is granted.

Accordingly, for the reasons stated below, the relief Plaintiffs seek is warranted under section 43(a) of the Lanham Act and New Jersey statutory and common law.

## ARGUMENT

## I.    THE SALE OF "BOOTLEG" MERCHANDISE VIOLATES PLAINTIFFS' EXCLUSIVE RIGHTS

Plaintiffs have the exclusive right to sell and license the sale of merchandise bearing the Artist's name, image and logos in connection with the East Rutherford Shows. The sale of counterfeit merchandise by defendants violates these rights and must be enjoined.

### A.    Defendants Are Violating Section 43(a) of the Lanham Act

The federal courts—including courts in this District—have repeatedly held that the use of registered and unregistered names, images and logos of musical artists by bootleggers violates section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a). See App'x A hereto; D'Angelo Decl. Exs. 1-8 (injunction prohibiting sale of bootleg tour merchandise issued against "Doe" bootleggers in New Jersey federal court); id. Exs. 9-29 (other previously-issued temporary restraining orders and preliminary

8

injunction federal and state court orders in similar matters); see also Merch Traffic, LLC v. John Does 1-100, Jane Does 1-100, and XYZ Company, Case No. 26-cv-3738-EP-AME (D.N.J. Apr. 13, 2026) (granting injunction and seizure order in favor of Bruce Springsteen's concert merchandise company and against unknown John and Jane Does, authorizing law enforcement officers to confiscate allegedly counterfeit Bruce Springsteen merchandise within a window before and after upcoming performances nationwide, beginning with an April 20, 2026 concert in the Prudential Center in Newark, New Jersey).

Section 43(a) is designed to prevent a wide range of conduct involving both registered and unregistered names, images and logos. Section 43(a) provides in pertinent part:

> Any person who, on or in connection with any goods or services . . . uses in commerce any word, term, name, symbol or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact which … is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship or approval of his or her goods, services or commercial activities by another person, . . . shall be liable in a civil action by any person who believes that he or she is likely to be damaged by such act.

15 U.S.C. § 1125(a)(1)(A). This broad prohibition against "unfair competition" covers not only confusion as to source or sponsorship between defendants' goods and Plaintiffs' goods, but it also prohibits the misappropriation of the efforts of others. See McKenney & Long, Federal Unfair Competition: The Lanham Act,

§ 2:04 (1989).  Section 43(a) codifies the principle articulated by the Supreme Court in Int'l News Serv. v. Associated Press, 248 U.S. 215, 239 (1918), that a party cannot "reap where it has not sown."

The elements of the claim for violation of Section 43(a) are: (1) that the mark is valid and protectable, and (2) that the defendant's use of the mark is likely to cause confusion among the consuming public.  Two Pesos, Inc. v. Taco Cabana Inc., 505 U.S. 763, 769-70 (1992).  The likelihood of confusion is determined by consideration of the following factors, articulated in Interspace Corp. v. Lapp, Inc., 721 F.2d 460, 463 (3d Cir. 1983):

> (1) [The] degree of similarity between the owner's mark and the alleged infringing mark; (2) the strength of the owner's mark; (3) the price of the goods and other factors indicative of the care and attention expected of consumers when making a purchase; (4) the length of time the defendant has used the mark without evidence of actual confusion; (5) the intent of the defendant in adopting the mark; (6) the evidence of actual confusion; (7) whether the goods, though not competing, are marketed through the same channels of trade and advertised through the same media; (8) the extent to which the targets of the parties' sales efforts are the same; (9) the relationship of the goods in the minds of consumers because of the similarity of functions; and (10) other facts suggesting that the consuming public might expect the prior owner to manufacture a product in the defendant's market or that he is likely to expand into that market.

Judged by these factors, there is no defense to defendants' use of the marks at issue.  The Artist's names, images and logos are strong protectable marks.  Using the traditional scale of marks from the generic to the arbitrary, Plaintiffs' marks are arbitrary; they do not describe the goods to which they are attached.  Thus, they are

10

entitled to the highest protection.  Defendant bootleggers will be copying these trademarks and images on infringing merchandise and selling such merchandise at the Artist's concerts.  The same items—T-shirts and other clothing, accessories, posters, and other typical concert merchandise—will be offered for sale in the same areas on the same dates by both the Plaintiffs and/or their licensees, on the one hand, and the bootleggers, on the other hand.  Concert-goers will not "shop around," but will make purchases wherever convenient upon their arrival at and/or departure from the concerts, and in the vicinity of the pop-up shops where officially licensed merchandise will be sold.  Moreover, where, as here, defendants are aware of the Plaintiffs' use of the mark, defendants' intent is presumed to be in bad faith.  See Nat'l Football League Props., Inc. v. New Jersey Giants, Inc., 637 F. Supp. 507, 518 (D.N.J. May 8, 1986) (finding bad faith intent where defendant's "intentional, willful, and admitted adoption" of a closely similar mark to the NEW YORK GIANTS raised the presumption of a likelihood of confusion and shifted the burden of proof to defendant to establish that there was no likelihood of confusion).

Intentional copying of the Artist's mark renders a likelihood of confusion a certainty.  Defendants have manufactured bootleg merchandise for the sole purpose of selling it in the vicinity of the concert venue and official pop-up shops.  It is beyond dispute that defendants have intentionally utilized, and will continue to intentionally utilize, the Artist's protected marks to deceive the public and create the

11

appearance that defendants' Bootleg Merchandise is sponsored by or originated with the Artist and Plaintiffs.  This is precisely the type of conduct that Section 43(a) was designed to prevent.

### B.   Defendants Are Violating The Right of Publicity

For more than 100 years, New Jersey has recognized an individual's right to prevent unauthorized, commercial appropriation of his or her name or likeness, resulting in a developed body of common law.  See Faulkner v. Hasbro, Inc., No. 15-6518 (KSH)(CLW), 2016 WL 3965200, at *1 (D.N.J. July 21, 2016); see also Hart v. Elec. Arts, Inc., 717 F.3d 141, 151 (3d Cir. 2013)  ("[T]he right to exploit the value of [an individual's] notoriety or fame belongs to the individual with whom it is associated, for an individual's name, likeness, and endorsement carry value and an unauthorized use harms the person both by diluting the value of the name and depriving that individual of compensation.").

Here, Plaintiffs have the exclusive right to control the commercial value of the names and likenesses of the members constituting the Artist in connection with the sale of merchandise at the East Rutherford Shows and to prevent others from exploiting that value without permission.  See Shin Decl. ¶¶ 2-3.  Defendants' have used, and will continue to use, the names, images, and likenesses of the Artist on the counterfeit products themselves as well as in connection with their sale, for commercial purposes and without any permission from Plaintiffs.  See Carruthers

Decl. Exs. 1-4; Joohae Decl. Exs. 1, 6-8.  Accordingly, every sale by the defendant bootleggers violates the Plaintiffs' right of publicity.

Plaintiffs have a strong likelihood of success on a right of publicity claim. The recordings and personal appearances of the Artist enjoy the highest commercial success and popularity.  Moreover, the Artist and Plaintiffs have embarked on a controlled program of merchandising, including at concert venues and pop-up stores and through official online channels.  The injunctive relief sought by Plaintiffs targets the unauthorized appropriation of these rights and the unauthorized application of the Artist's name and likeness to novelty merchandise.

## C.    Defendants Are Engaging in Unfair Competition

The common law prohibits unfair competition.  See Int'l News Serv. v. Associated Press, 248 U.S. 215, 239 (1918) (a party cannot "reap where it has not sown").  The Third Circuit has applied an "identical test" to both common law unfair competition claims and claims made under the Lanham Act.  See Am. Tel. & Tel. Co. v. Winback & Conserve Program, Inc., 42 F.3d 1421, 1433 (3d Cir. 1994); see also Birthright v. Birthright Inc., 827 F. Supp. 1114, 1140–41 (D.N.J. 1993) ("It is well established that the test for a common law unfair competition claim under New Jersey law is essentially the same as under the federal Lanham Act.")  Accordingly,

13

common law unfair competition is manifest in the instant case for the same reasons stated above in connection with Plaintiffs' Lanham Act claim.[2]

## II.   PLAINTIFFS ARE ENTITLED TO A TEMPORARY RESTRAINING ORDER, AN ORDER OF SEIZURE, AND A PRELIMINARY INJUNCTION

This action is aimed at bootleggers—groups of individuals who manufacture counterfeit merchandise and sell it whenever the Artist performs live. The only available remedy which can protect Plaintiffs and the Artist is injunctive relief, including an order of seizure.

### A.   An Injunction and Order of Seizure Are Appropriate

As part of the injunctive relief sought, it is necessary to seize the subject goods manufactured, sold and/or distributed for sale by defendants in order to render complete relief herein, prevent irreparable injury to Plaintiffs due to defendants' conduct in counterfeiting these items, and prevent these items from being destroyed or transferred to parties outside this litigation.

Federal and state courts have repeatedly issued temporary restraining orders and orders of seizure, in advance of concerts, to stop the sale of bootleg merchandise.

---

[2] The same is true for a claim under New Jersey's Unfair Competition Act. See Buying For The Home, LLC v. Humble Abode, LLC, 459 F. Supp. 2d 310, 317-18 (D.N.J. Oct. 20, 2006) (holding that the analysis of the New Jersey statutory and common law claims of trademark infringement and unfair competition is the same as under the federal trademark infringement claim); see also J & J Snack Foods, Corp. v. Earthgrains Co., 220 F. Supp. 2d 358, 374 (D.N.J. Sep. 25, 2002) (same).

14

See, e.g., App'x A hereto; D'Angelo Decl. Exs. 1–29.  This procedure is specifically authorized by statute.  Section 44 of the Lanham Act, 15 U.S.C. § 1116, specifically provides for injunctions "upon such terms as the court may deem reasonable" to prevent the infringement of registered trademarks and violations of section 43(a).  15 U.S.C. § 1116(a); see id. § 1118 (a court has the authority to order delivery, seizure and destruction of merchandise which violates a registered trademark or section 43(a) of the Lanham Act); id. § 1114 (remedies for violation of registered trademarks also available for acts of unfair competition).

In virtually all of the cases cited herein where a wholly ex parte restraining order was awarded in the context of John Doe lawsuits, the courts have granted the ancillary remedy of seizure.  For example, in Big Hit Entertainment Co. Ltd. v. Various John Does, et al., Case No. 19-CV-03070 (N.D. Ill. 2019), HYBE (then known as "Big Hit Entertainment") sought an ex parte temporary restraining order and order of seizure against bootleggers selling T-shirts and other garments bearing the Artist's trademark in connection with the group's concert performances at Soldier Field in Chicago, Illinois, and MetLife Stadium in East Rutherford, New Jersey.  The court recognized that immediate and irreparable injury would ensue before defendants could be given notice and an opportunity to be heard and, therefore, authorized the U.S. Marshall, state and local police, HYBE's representatives, and/or others acting under HYBE's supervision to:

15

> seize and impound any and all Bootleg Merchandise bearing the Artist's Trademark which defendants, or those acting in concert with defendants, attempt to sell or are holding for sale in connection with any of the Artist's concert performances (including any carton, container, or other means of carriage in which the Bootleg Merchandise is found) from four (4) days before to one (1) day after any concert performance of the Artist, and within a ten (10) mile radius of any concert performance of the Artist[.]

D'Angelo Decl. Ex. 11, at 3; see id. Exs. 9-10, 30 (other ex parte seizure orders issued in Plaintiffs' favor); id. Exs. 1-8 (examples of ex parte seizure orders issued by New Jersey district courts); see also Exs. 12-29 (examples of ex parte seizure orders issued by other courts).

Moreover, a seizure order should be granted under the traditional standard of Rule 65 of the Federal Rules of Civil Procedure, which permits the issuance of temporary restraining orders without notice where "immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition." Fed. R. Civ. P. 65(b)(1)(A). In cases of trademark infringement and unfair competition such as this one, the fact that there is a likelihood of confusion constitutes irreparable injury as a matter of law sufficient to satisfy the requirements of Rule 65(b). See 15 U.S.C. § 1116.

Furthermore, defendant bootleggers' manner of operating renders inevitable the requisite "immediate and irreparable injury, loss, or damage" under Rule 65(b). As the accompanying Declaration of Andrew Polner details, bootleggers' sales of

16

infringing goods at or near a musical group's concert venue result in two primary forms of injury to the musical group and its licensees:

> First, the bootleggers are not bound by contract to provide first quality apparel and graphic designs, as is required of licensed merchandisers. The musical group's fans suffer because they are buying imitation goods. Disappointed fans may be confused as to the source of the merchandise and may blame the artists for poor quality. This adversely affects future legitimate sales and tends to create a negative feeling by the fans directed against the artists.

> Second, with no obligation to pay royalties to the artist or concert venue, bootleggers can drastically undersell the legitimate merchandisers like Amazon. This ability to undersell the legitimate merchandiser is enhanced by the fact that bootleggers likely do not collect or pay sales taxes. These unfairly low prices deprive legitimate merchandisers of sales.

Polner Decl. ¶¶ 6-7; see D'Angelo Decl. ¶ 16 ("Absent the relief requested, . . . the loss of merchandising income at even a single concert performance could amount to tens of thousands of dollars. This damage is compounded by the injury to the goodwill of the Artist and Plaintiffs through the distribution of inferior merchandise, which inevitably is associated with the Artist and Plaintiffs."). As another federal court acknowledged in granting an ex parte temporary restraining order in connection with sales of bootleg Billy Joel merchandise at one of the artist's concerts: "Obviously, the presence of the unauthorized vendors outside the concert halls hurts the sales of [the licensing company's] merchandise and damages Billy Joel who receives a percentage of such sales." Joel v. Various John Does, 499 F. Supp. 791, 792 (E.D. Wis. 1980).

17

The irreparable harm from defendants' selling and distribution activities is manifest from the supporting declarations.  Because the defendants are engaging in patently unlawful activities, making a business of selling infringing articles, and have an economic interest in continuing their unlawful actions, there is no reason to believe they will voluntarily stop.  Providing relief to Plaintiffs without notice to defendants is necessary to ensure that defendants do not evade this Court and continue their infringing activities elsewhere.  For example, in Vuitton v. White, 945 F.2d 569 (3d Cir. 1991), the U.S. Court of Appeals for the Third Circuit acknowledged that complete injunctive relief must be accorded to parties who face the anomaly whereby the products subject to the injunction may be transferred or destroyed prior to the enforcement of the injunction by a court of competent jurisdiction.  See id. at 575 ("where … notice will cause the defendants to conceal or destroy the counterfeit merchandise and the undisputed facts show that counterfeit merchandise is being sold despite an outstanding permanent injunction against some of the defendants, it is an abuse of discretion for the court to deny § 1116(d) relief without explaining how an ex parte restraining order can be expected to effectively alter the defendants' behavior.").  See also Matter of Vuitton et Fils S.A., 606 F.2d 1, 4 (2d Cir. 1979) ("Immediate action is vital when imminent destruction of the disputed property, its removal beyond the confines of the state, or its sale to an innocent third party is threatened.  In these situations, giving the defendant notice of

18

the application for an injunction could result in an inability to provide any relief at all.") (citation and internal quotations omitted).

**B.    A Temporary Restraining Order, Without Notice, Is Available to Enjoin Activities of Persons Whose Identities Are Unknown**

As explained in the accompanying D'Angelo Declaration, Plaintiffs should not be required to provide formal notice to defendants for the independent reason that, as a practical matter, defendants cannot positively be identified until the time at which they are engaged in their unauthorized and illegal activity and they are actually served with a copy of the Complaint and the Court's Order.  See D'Angelo Decl. ¶¶ 18-19.  Bootleggers are well aware of the illegal nature of their activities and therefore conceal their presence and intentions until just prior to the show, making it even more difficult, if not impossible, to identify and provide notice to defendants.  Id. ¶ 18.  Indeed, the identities of the individual bootleggers will not be known until they are stopped and the goods are seized, and, even then, the bootleggers often refuse to provide their true identities.  Id.

This is precisely why in each of the cases cited in Appendix A hereto and annexed to the D'Angelo Declaration, the action was commenced against John and Jane Doe defendants and a temporary restraining order and seizure order was issued. As this Court recently recognized in Merch Traffic, LLC v. Does 1-100, 686 F. Supp. 3d 380 (D.N.J. Aug. 4, 2023), on a nearly identical application granting the seizure of bootleg merchandise in connection with concert performances in the venue and

19

in other jurisdictions nationwide, the use of "Doe" designations was appropriate because the defendants "cannot be readily found so as to be served – and if they are served, they take steps to thwart follow-on action, like destroying evidence and declining to participate in judicial proceedings." See id. at 383. The exact same is true here.

As noted above, Rule 65(b) authorizes this Court to grant a temporary restraining order coupled with an order of seizure without notice against unidentified defendants, where—as here—"immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition." Fed. R. Civ. P. 65(b)(1)(A); see supra Section II.A. Moreover, the Lanham Act specifically contemplates that a TRO and seizure order against infringing merchandise may be had on ex parte application. It authorizes such an order where, in addition to the traditional requirements for injunctive relief, an order other than an ex parte seizure order is not adequate, the applicant has not publicized the requested seizure, and the person against whom seizure would be ordered would destroy or otherwise make inaccessible to the court the infringing materials. 15 U.S.C. § 1116(d)(4)(B).

Here, the only effective remedy is an ex parte TRO and seizure order. As explained above, even if the identities of some of the bootleggers could be obtained, they should not be given notice of the seizure because they likely would conceal or

20

destroy the Bootleg Merchandise and all other evidence of their infringing activities, including any evidence which would disclose the identity of their suppliers and other persons acting in concert with them.  See D'Angelo Decl. ¶ 20.  An ex parte order from this Court enjoining further infringing conduct and authorizing the seizure of defendants' Bootleg Merchandise will permit Plaintiffs to prevent the sale of such merchandise and to obtain important evidence, including (i) evidence of defendants' trademark infringement, unlawful competition, and violation of Plaintiffs' rights of publicity and privacy; (ii) evidence to establish defendants' unlawful earnings (*e.g.*, books and records); and (iii) evidence of the persons and entities supplying and acting in concert with Defendants.  Id.

C.    **The Threatened Injury to Plaintiffs Outweighs Potential Harm to Defendants**

Plaintiffs have demonstrated that the defendants' sale of infringing merchandise bearing the Artist's trademarks poses imminent and irreparable harm, and that Plaintiffs lack control over the infringing merchandise and its quality. Accordingly, Plaintiffs will suffer a loss of goodwill due to sales of inferior Bootleg Merchandise.  See Polner Decl. ¶¶ 6-7; D'Angelo Decl. ¶ 16; SKS Merch, LLC v. Barry, 233 F. Supp. 2d 841, 847 (E.D. Ky. 2002) ("Plaintiffs have independently established that they will be irreparably harmed absent an [*sic*] Preliminary Injunction enjoining the sale of bootleg merchandise related to [Toby] Keith throughout the nation.").  Plaintiffs have also demonstrated that the threatened injury

to Plaintiffs outweighs the potential harm to the defendants.  See Hard Rock Cafe Licensing Corp. v. Pacific Graphics, Inc., 776 F. Supp. 1454, 1463 (W.D. Wash. 1991) ("Hard Rock Café" logo symbolizes the "goodwill connected with [plaintiffs] business, and that goodwill should not be jeopardized by placing it in the hands of [defendants]").  Any inconvenience to the defendants will be merely economic, consisting primarily of lost profits from their unlawful distribution of the Bootleg Merchandise.  Critically, the proposed order prohibits the sale and authorizes the seizure of only that merchandise which violates the Trademarks and publicity rights of Plaintiffs and/or the Artist, and Plaintiffs will be required to post a bond to cover any damages which may be incurred in the unlikely event that any party is wrongfully restrained.

### D.    Plaintiffs Are Entitled to a Nationwide Preliminary Injunction

Once the defendants have been served, the Court will acquire personal jurisdiction over them.  See Fed. R. Civ. P. 4.  At such time, the defendants will also be identified to the Court by proof of service (assuming they provide their true identities), upon which the Court will have grounds to preliminarily enjoin them for the remainder of the Tour.  See Fed. R. Civ. P. 65(a)(1) ("The court may issue a preliminary injunction only on notice to the adverse party."). Similarly, each time there is a seizure pursuant to the preliminary injunction, the requirement of notice to the person against whom the relief operates will be satisfied.  Once the preliminary

22

injunction is issued, it will be served on anyone selling bootleg merchandise at concerts on the Tour. The bootleggers, therefore, will have notice of the injunction at the concert and when their goods are seized.[3] If Plaintiffs are to realize meaningful relief from defendants' bootlegging activity, a nationwide preliminary injunction against defendants and those acting in concert with them is appropriate and required.

Absent such a nationwide injunction, complete relief here would be impossible to achieve. Without the proposed seizure order, Plaintiffs will be forced to file separate civil actions and seek separate temporary restraining orders in each of the ten (6) U.S. district courts in whose districts the Tour will play on the remainder of the U.S. leg of the Tour—not only in this District, but also in the federal district courts encompassing Foxborough, Massachusetts; Baltimore, Maryland; Arlington, Texas; Chicago, Illinois; and Los Angeles, California. The estimated expense of filing these multiple duplicative actions would be in excess of $300,000 in legal fees and costs, imposing a substantial financial burden upon Plaintiffs. This undertaking would also drain the valuable judicial resources of the federal courts.

---

[3] To the extent that it is difficult or impractical for any of the bootleggers whose goods are seized to come to this District to contest the applicability of the injunction, Plaintiffs have no objection to that challenge being heard in the district where the seizure took place. Plaintiffs will waive any objections to the location of any action contesting the applicability of the preliminary injunction to a particular bootlegger.

The Lanham Act provides for enforcement and service "anywhere in the United States where [Defendants] may be found." 15 U.S.C. § 1116(a); see The Five Platters, Inc. v. Purdie, 419 F. Supp. 372, 384 (D. Md. 1976) ("the Lanham Act provides for nationwide enforcement of injunctions"). Federal courts throughout the U.S.—including in this District—have enjoined John Doe bootleggers from violating the Lanham Act in the same fashion sought by the instant application. See D'Angelo Decl. Exs. 1-8; 11-29. For example, within the past four years—**and as recently as this year**—this Court has enjoined bootlegging activities at future concert performances in other districts for the tours of Bruce Springsteen, The Weeknd, The Jonas Brothers, Beyonce, Imagine Dragons, and Lady Gaga. See id. Exs. 1-8. Likewise, in 2024 and 2025, other courts granted similar relief in connection with concert tours for Kendrick Lamar, SZA, Olivia Rodrigo, and Blink-182. See id. Exs. 12-14. The Artist's popularity and commercial success are at least as significant (if not substantially more so) as those major touring acts.

It is well-settled that an injunction issued by a federal district court having in personam jurisdiction operates continuously and perpetually upon parties to the action throughout the United States. See Leman v. Krentler-Arnold Hinge Last Co., 284 U.S. 448, 451 (1932); Kessler v. Eldred, 206 U.S. 285, 288 (1907); Rubber Tire Wheel Co. v. Goodyear Tire & Rubber Co., 232 U.S. 413, 417 (1914). In Leman, the Supreme Court considered a contempt proceeding against a party to a permanent

24

injunction granted in the District of Massachusetts.  The Court held that a party to the injunction "could not escape the decree by removing from, or staying without, the District of Massachusetts.... Disobedience [of the injunction] constituted contempt of the court which rendered the decree, and was none the less contempt because the act was committed outside the district, as the contempt lay in the fact, not in the place, of the disobedience to the requirement."  Leman, 284 U.S. at 451-52.  Thus, the Court recognized in Leman the necessity of dispensing with the requirement that a court maintain physical control over a party to bind it to a district court's injunction—which "was a decree which operated continuously and perpetually upon the respondent in relation to the prohibited conduct" and "was binding upon the respondent, not simply within the District of Massachusetts, but throughout the United States."  Id. at 451.

The federal appellate courts have diligently enforced the extraterritorial power of the district courts.  For example, the Seventh Circuit Court of Appeals, relying on Leman, held that "[t]raditional injunctions … are not registrable under [28 U.S.C.] § 1963 . . . because that would be pointless: they act *in personam* nationwide."  Pacific Reins. Mgmt. Corp. v. Fabe, 929 F.2d 1215, 1218 (7th Cir. 1991) (citation omitted).  In Stiller v. Hardman, 324 F.2d 626 (2d Cir. 1963), the Second Circuit held that an Ohio district court could enforce and punish a violation of an injunction that it issued though the actual violation took place in New York, stating that the

25

"mandate of an injunction issued by a federal district court runs throughout the United States." Id. at 628. The district courts have enforced their extraterritorial injunctive power as well. See, e.g., In re $uicideboy$ Trademark Litig., 796 F. Supp. 3d 1310, 1320-32 (N.D. Ga. 2025) (holding the court can exercise personal jurisdiction over defendants accused of trademark infringement who have no connection to the district when nationwide service of process is authorized by Lanham Act). The long history and robust extraterritorial enforcement of district courts' injunctive powers support Plaintiffs' assertion that this Court may enforce an injunction it issues throughout the United States regardless of where a violation of the injunction may occur.

Finally, recent U.S. Supreme Court precedent on nationwide injunctions does not bar the relief which Plaintiffs seek. In its recent decision in Trump v. CASA, Inc., 606 U.S. 831 (2025), the Supreme Court specifically held that it was not barring multi-jurisdictional orders such as the one sought here, but rather only "universal" injunctions—which are injunctions that can be applied to or used by similarly-situated non-parties. As the Supreme Court stated, "[e]ven a traditional, parties-only injunction can apply beyond the jurisdiction of the issuing court." See id. at 837 n.1 (citing Steele v. Bulova Watch Co., 344 U.S. 280, 289 (1952) (when "exercising its equity powers," a court "may command persons properly before it to cease or perform acts outside its territorial jurisdiction")); see also Epic Games, Inc. v.

26

Google LLC (In re Google Play Store Antitrust Litig.), 147 F.4th 917, 959 (9th Cir. 2025) (stating that Trump v. CASA "clarified that a restriction on 'universal injunctions' does nothing to change the fact that 'a traditional, parties-only injunction can apply beyond the jurisdiction of the issuing court'"); In re $uicideboy$ Trademark Litig., 796 F. Supp. 3d at 1331 ("It would run directly counter to the express purposes of the [Trademark Counterfeiting Act]— 'encourag[ing] private enforcement' and assisting courts to 'effectively exercise their jurisdiction'—to circumscribe the personal jurisdiction afforded by its nationwide service of process provision.") (citation omitted; second alteration in original).

The nationwide relief sought by Plaintiffs is narrowly tailored for use solely for Plaintiffs, solely for the Artist's Trademarks, solely in connection with the remainder of the current U.S. Tour, and solely to enjoin those Defendants who sell bootleg and infringing merchandise in the vicinity of the concert venues on that tour. Because the Defendant bootleggers neither have a fixed location nor keep records of their unlawful activities, a nationwide injunction and seizure order is the only proven method of providing complete relief to Plaintiffs.

27

## CONCLUSION

Based on the foregoing, Plaintiffs respectfully request that the Court grant their application for a temporary restraining order, order of seizure, and preliminary injunction.

Dated:  July 10, 2026

Respectfully submitted,

LOEB & LOEB LLP


By:  */s/ John A. Piskora*

John A. Piskora (NJ ID 005412001)
jpiskora@loeb.com
Frank D. D'Angelo (*pro hac vice forthcoming*)
fdangelo@loeb.com
Jeffrey C. Prystowsky (*pro hac vice forthcoming*)
jprystowsky@loeb.com
LOEB & LOEB LLP
345 Park Avenue
New York, NY  10154
Telephone:  +1 212-407-4000
Facsimile:  +1 212-407-4990

Attorneys for Plaintiffs,
HYBE Co. Ltd., BIGHIT MUSIC Co.
Ltd., and HYBE America, Inc.

28

## APPENDIX "A"

## EX PARTE SEIZURE ORDERS IN MUSICAL GROUP-RELATED CASES

1.      <u>Merch Traffic, LLC v. Does</u>, Case No. 26-cv-3738-EP-AME (D.N.J. 2026) (Judge Padin) ("Bruce Springsteen");

2.      <u>Bravado v. Does</u>, Case No. 2:25-cv-6020-MCA-CLW (D.N.J. 2025) (Judge Cox Arleo) (concerning the musical group "The Weeknd");

3.      <u>Parkwood Touring, Inc. v. Does</u>, Case No. 2:25-cv-04878-CCC-AME (D.N.J. 2025) (Judge Cecchi) ("Beyonce");

4.      <u>Merch Traffic v. Does</u>, Case No. 25-cv-13960 KSH (D.N.J. 2025) (Judge Hayden) ("Jonas Brothers");

5.      <u>Bravado v. Does</u>, Case No. 2:24-cv-09555 CCC-LDW (D.N.J. 2024) (Judge Cecchi) ("Billie Eilish");

6.      <u>Parkwood Merch, LLC v. Does</u>, Case No. 2:23-cv-03936-MCA-ESK (D.N.J. 2023) (Judge Cox Arleo) ("Beyonce");

7.      <u>Bravado et al. v. Does</u>, Case No. 2:22-cv-04859-CCC-JRA (D.N.J. 2022) (Judge Cecchi) ("Lady Gaga");

8.      <u>Bravado et al. v. Does</u>, Case No. 1:22-cv-04953-KMW-MJS (D.N.J. 2022) (Judge Williams) ("Imagine Dragons");

9.      <u>Bravado et al. v. Does</u>, Case No. 4:25-cv-1766 CRE (S.D. Tex. 2025) (Judge Eskridge) ("Kendrick Lamar and SZA");

1

10.    Bravado v. Does, Case No. 4-24-cv-00585 (S.D. Tex. 2024) (Judge Rosenthal) ("Olivia Rodrigo");

11.    Bravado v. Does, Case No. 1:24-cv-1716 RMR (D. Colo. 2024) (Judge Rodriguez) ("Blink-182");

12.    Bravado v. Does, Case No. 1:23- cv-11344-RWZ (D. Mass. 2023) (Judge Zobel) ("Morgan Wallen");

13.    Merch Traffic. v. Does, Case No. 1:22- cv-06839-AT (S.D.N.Y. 2022) (Judge Vyskocil) ("Harry Styles");

14.    HYBE Co. Ltd. f/k/a Big Hit Entertainment Co. Ltd. et al. v. John Does 1-100 et al., Case No. 21AHCV00077 (Cal. Super. Ct. 2021) ("BTS");

15.    Big Hit Entertainment Co. Ltd. v. John Does 1-100 et al., Case No. 19GDCV00547 (Cal. Super. Ct. 2019) ("BTS");

16.    Big Hit Entertainment Co. Ltd. v. Various John Does et al., Case No. 19-CV-03070 (N.D. Ill. 2019) ("BTS");

17.    HYBE Co. Ltd. et al. v. John Doe et al, Case No. 8:26-cv-01039-SDM-TGW (M.D. Fla. 2026) ("BTS");

18.    Live Nation Merchandise, Inc. v. John Does 1-100, et al., Case No. 18-CV-07551-LAP (S.D.N.Y. 2018) ("Drake");

19.    CTR Touring v. Rickey Robertson, et al., Case No. 17-cv-02939 (N.D. Ill. 2017) ("Chance the Rapper");

2

20.    Leidseplein Presse, B.V. v. Various John Does, et al., Case No. 16-CV-2031 (N.D. Ill. 2016) ("AC/DC");

21.    TSURT, LLC v. Does, Case No. 16 CV 60647 (S.D. Fla. 2016) (Judge Scola & Ungaro) ("Pearl Jam");

22.    TAS Rights Mgmt. v. Barber, case No. 3-15 0589 (M.D. Tenn. 2015) (Judge Trauger) ("Taylor Swift");

23.    Live Nation v. John Does, et al., Case No. 2:12-cv-03527-ABC-JEM (C.D. Cal. 2012) (Judge Collins) ("Coldplay");

24.    Arnie Barn, Inc. v. Does, Case No. 11 cv-540-T-RAL (M.D. Fla. 2011) (Judge Lazarra) ("Kenny Chesney");

25.    Live Nation v. Does, et al., Case No. 1:11-cv-01297-CMA (D. CO. 2011) (Judge Arguello) ("U2");

26.    F.E.A., Inc. v. Hill, Case No. 8:10-cv-00919-RAL-MAP (M.D. Fla. 2010) (Judge Lazarra) ("Jimmy Buffett");

27.    Live Nation Merchandising, Inc. v. Smith, Case No. 8:10-cv-00371-VMC-AEP (M.D. Fla. 2010) (Judge Covington) ("Black Eyed Peas");

28.    Leidseplein Presse, B.V. v. Various John Does, et al., Case No. 08-CV-6047 (N.D. Ill. 2008) ("AC/DC");

29.    Steerpike Productions, Inc. v. John Does 1-100, et al., Case No. C-07-02989 RMW (N. D. Cal. 2007) ("The Police");

3

30. _Giant Merchandising v. Harris_, Case No. 8:06-cv-1200-RAL-E J (M.D. Fla. 2006) (Judge Lazarra) ("Kelly Clarkson");

31. _Pearl Jam, L.L.C. v. John Does 1-100, et al._, Case No. 1:06-cv-02633 (N. D. Ill. 2006)("Pearl Jam");

32. _Giant Merchandising v. Davis_, Case No. 8:05-cv-01723-S_B-TBM (M.D. Fla. 2005) (Judge Kovachevich/Bucklew) ("Kenny Chesney");

33. _RST (2005), Inc. v. John Does 1-100, et al._, Case No. 05-11680WGY (D. Mass. 2005) ("The Rolling Stones");

34. _Megadeth, Inc. v. John Does 1-100, et al._, Case No. Civ. 04-08822 (S.D.N.Y. 2004) ("Megadeth");

35. _Anthill Trading Ltd. v. John Does 1-100, et al._, Case No. 04-2919 (FLW) (D.N.J. 2004) ("Sting");

36. _Grateful Dead Productions v. John Does 1-100, et al._, Case No. 04-C-699 (E.D. Wisc. 2004) ("The Grateful Dead");

37. _Paisley Park Inc. v. Various John Does, et al._, Case No. 2004-CV-2067 (C.D. Ill. 2004) ("Prince");

38. _Yessup Touring, II, LLC v. John Does 1-100, et al._, Case No. 04-2837 (DMC) (D.N.J. 2004) ("Sting");

39. _Linkin Park LLC d/b/a Linkin Park Merchandising v. John Does 1-100, et al._, Case No. 04 Civ. 0112 (E.D.N.Y. 2004) ("Linkin Park");

4

40.     <u>ABB Merchandising Co., Inc. v. John Does 1-100, et al.</u>, Case No. 04 CV 2026 (RCC) (S.D.N.Y. 2004) ("The Allman Brothers Band");

41.     <u>Grateful Dead Productions v. John Does 1-100, et al.</u>, Case No. 4:03-CV-41 (E.D. Tenn. 2003) ("The Grateful Dead");

42.     <u>ABB Merchandising Co., Inc. v. John Does 1-100, et al.</u>, Case No. 03 Civ. 1663 (DC) (S.D.N.Y. 2003) ("The Allman Brothers Band");

43.     <u>Linkin Park LLC d/b/a Linkin Park Merchandising v. John Does 1-100, et al.</u>, Case No. 03 Civ.1664 (S.D.N.Y. 2003) ("Linkin Park");

44.     <u>Pearl Jam, L.L.C. v. John Does 1-100, et al.</u>, Case No. CV-03-203J (E.D.N.Y. 2003) ("Pearl Jam").

45.     <u>Linkin Park LLC d/b/a Linkin Park Merchandising v. John Does 1-100, et al.</u>, Case No. 02 C0762 (N.D. Ill. 2002) ("Linkin Park");

46.     <u>RST (2005), Inc. v. John Does 1-100, et al.</u>, Case No. 02-11706 EFH (D. Mass. 2002) ("The Rolling Stones");

47.     <u>ABB Merchandising Co., Inc. v. John Does 1-100, et al.</u>, Case No. 02 CV 1957 (S.D.N.Y. 2002) ("The Allman Brothers Band");

48.     <u>Viking Wizard Eyes, Inc. p/k/a Blink-182 v. John Does 1-100, et al.</u>, Case No. 01-CV-5053 (N.D. Ill. 2002) ("Blink 182");

49.     <u>ABB Merchandising Co., Inc. v. John Does 1-100, et al.</u>, Case No. 01-CV-2108 (S.D.N.Y. 2001) ("The Allman Brothers Band");

5

50.     Poo Poo Butt, Inc., p/k/a Blink-182 v. John Does 1-100, et al., Case No. 00-04707 (C.D. Cal. 2000) ("Blink 182");

51.     ABB Merchandising Co., Inc. v. John Does 1-100, et al., Case No. 00 CV 1637 (BSJ) (S.D.N.Y. 2000) ("The Allman Brothers Band");

52.     Pearl Jam, L.L.C. v. John Does 1-100, et al., Case No. 98-C-0587 (E.D. Wisc. 1998) ("Pearl Jam");

53.     TNA Tour II (USA) Inc. v. John Does 1-100, et al., Case No. 97-C-6517 (CRN) (N.D. Ill. 1997) ("The Rolling Stones");

54.     H.O.R.D.E. Corporation v. John Does 1-100, et al., Case No. C-97-20587 (JW) (N.D. Cal. 1997) ("H.O.R.D.E. Festival");

55.     360 Degree Shoutout, Inc. v. John Does 1-100, et al., Case No. 97-CV-2504 (JS) (E.D.N.Y. 1997) ("No Doubt").

243687702

6